**JW CONSTRUCTION COMPANY, INC., a Colorado corporation, Plaintiff–Appellant,**

and

**Joseph Wodiuk, Third–Party Defendant–Appellant,**

v.

**Ryan K. ELLIOTT, a/k/a Ryan Elliott, and Christana R. Elliott, a/k/a Christana Elliott, Defendants and Third–Party Plaintiffs–Appellees.**

No. 10CA0244.

Colorado Court of Appeals, Div. II.

March 17, 2011.

Sherman & Howard, LLC, Bret R. Gunnell, Katherine D. Varholak, Matthew O.

Stromquist, Denver, Colorado; Anderson, Dude, Bailey & Lebel, P.C., Steven P. Bailey, Colorado Springs, Colorado; for Plaintiff–Appellant and Third–Party Defendant–Appellant.

Pendleton, Friedberg, Wilson & Hennessey, P.C., Edward M. Allen, Denver, Colorado, for Defendants and Third–Party Plaintiffs–Appellees.

Opinion by Judge CASEBOLT.

This is a homeowner-builder dispute between defendants and third-party plaintiffs, Ryan K. Elliott and Christana R. Elliott, landowners who were building a custom home; plaintiff, JW Construction Co., Inc., their general contractor; and third-party defendant, Joseph Wodiuk, the president of JW. Wodiuk and JW appeal the judgment that found them liable for misrepresentation and concealment and imposed costs and attorney fees upon them for filing excessive mechanics' liens. We affirm in part, reverse in part, and remand.

## I. Background

The Elliotts hired JW to construct a custom home for them. After construction had begun, JW and the Elliotts signed a formal agreement that provided for specified prices on some portions of the construction, "allowances" for other portions, and progress payments ("draws") each month based on the "costs actually expended" by JW in the previous month. The Elliotts also agreed to a change order requiring payment for additional sums when they signed the formal agreement.

The Elliotts paid the amount specified in the change order and also paid the first four draws that JW submitted to them, but noted that the documentation submitted with some of the draw requests did not fully account for the total amount requested. The Elliotts asked JW to submit complete records to back up these draw requests, but JW failed to do so. JW submitted two more draw requests, numbered five and six, but the Elliotts refused to pay them and terminated the contract. The Elliotts paid the subcontractors directly for the work that was documented in

draws five and six, notified JW on March 14, 2006, that they had made these payments, and continued construction of the home on their own.

JW filed its first mechanics' lien, which was for the entire amount requested in draw five, on March 15, 2006. JW filed its second mechanics' lien, which was for the entire amount requested in draw six, on May 5, 2006.

JW then commenced this action against the Elliotts to foreclose its mechanics' liens and also asserted claims for breach of contract, unjust enrichment, promissory estoppel, and quantum meruit. The Elliotts counterclaimed against JW and filed a third-party complaint against Wodiuk, asserting claims for breach of contract, negligence, misrepresentation and fraudulent concealment, and excessive liens. In response, JW and Wodiuk asserted, among other things, that the Elliotts' tort claims were barred by the economic loss rule. JW and Wodiuk also asserted this defense, with no further elaboration, in the trial management order. They did not, however, bring this assertion to the trial court's attention by any motion or argument before, during, or after trial.

At trial, the Elliotts presented evidence that the contract was a cost-plus contract, in which the total contract price would reflect the actual costs of construction plus a percentage fee. JW and Wodiuk presented evidence that the contract was a fixed price contract subject to allowances, in which certain portions of construction would be completed for a fixed price, and certain portions would be completed for the actual costs of construction plus JW's fee. The trial court determined that the contract was a fixed price contract subject to allowances.

The Elliotts also presented evidence at trial that JW had altered or fabricated three invoices, which were submitted as backup for draw requests one and four. The Elliotts argued that because of these misrepresentations, they paid JW more than its "costs actually expended." They contended that JW had breached the contract because the agreement allowed only periodic payments for actual costs incurred, that they were justified in terminating JW, and that they were

entitled to damages amounting to the increased cost of completion that they had incurred after termination of the contract.

In addition, the Elliotts presented evidence that, at the time they agreed to the change order, JW and Wodiuk knew that the items covered in the change order would not cost more than the amounts already itemized with fixed prices in the final contract. The Elliotts argued that these actions constituted misrepresentation and concealment, which induced them to agree to the change order and to pay the additional sums noted in it. The Elliotts also argued that the altered and fabricated invoices constituted misrepresentations and that they were entitled to damages in tort against both JW and Wodiuk for the amount they overpaid JW.

JW argued that the Elliotts had breached the contract by terminating it without justification and by failing to pay the amounts requested in draws five and six. In the alternative, it requested payment of the amounts of the draws under the equitable theories of relief that it had pleaded. In addition, it asserted that the Elliotts suffered no damages because the amount that they paid, even if more than the actual costs of construction, was still not more than the fixed price agreed to in the contract.

Following a bench trial, the court found that JW had altered or fabricated three of the invoices that were attached as backup documentation for the draw requests. It determined that the submission of draw requests for more than JW's actual costs constituted a breach of the payment provision of the contract, and that the altered and fabricated invoices constituted a breach of the duty of good faith and fair dealing. It therefore determined that the Elliotts were justified in terminating the contract with JW. However, it awarded only one dollar in damages on the contract claim because it determined that the Elliotts had significantly changed the planned construction after JW's breach, and had not met their burden to prove the cost of completion without those changes.

The trial court also determined that the altered and fabricated invoices were misrep-

resentations and that JW had fraudulently concealed information about its true costs to complete the change order. It found that the Elliotts had paid JW more than the actual costs of construction and awarded damages to the Elliotts. It further found that Wodiuk had participated in the misrepresentations and concealment and held him personally liable.

The trial court also found that at the time JW filed its mechanics' liens, it was aware that the Elliotts had paid directly to subcontractors at least some portions of draws five and six and, therefore, the liens were excessive. Furthermore, the court determined that because JW had intentionally misrepresented amounts in the prior draws, it knew that the full amounts of draws five and six were not due under the contract. The court awarded costs and attorney fees to the Elliotts and against JW pursuant to section 38–22–128, C.R.S.2010, for defending against these excessive liens. Concerning JW's equitable claims, the trial court determined that JW had not conferred any benefit for which the Elliotts had not already paid.

Upon the Elliotts' posttrial motion, the trial court amended the judgment to impose personal liability against Wodiuk for the costs and attorney fees awarded upon the excessive lien claim. This appeal followed.

## II. Wodiuk's Liability for Filing Excessive Lien

Wodiuk contends that because the excessive lien statute only allows for recovery of costs and attorney fees against the person who files the lien, and he did not file the lien in this case, the trial court erred by holding that he was personally liable for these amounts. We agree.

### A. Standard of Review

■ We interpret statutes de novo. *Dubois v. People,* 211 P.3d 41, 43 (Colo.2009). In construing a statute, we must give effect to the intent of the legislature. *Id.* If the legislative intent is clear from the plain language of the statute, there is no need to resort to interpretive rules of statutory construction. *McKinney v. Kautzky,* 801 P.2d 508, 509 (Colo.1990).

### B. Law

Section 38–22–128 provides:

Any person who files a lien under this article for an amount greater than is due without a reasonable possibility that said amount claimed is due and with the knowledge that said amount claimed is greater than that amount then due, and that fact is shown in any proceeding under this article, shall forfeit all rights to such lien plus such person shall be liable to the person against whom the lien was filed in an amount equal to the costs and all attorney's fees.

### C. Application

■ It is undisputed that JW, a corporation, was the entity that signed the construction contract and filed the liens at issue here. According to the plain language of the statute, only the "person who files a lien" is liable for costs and attorney fees. Because a corporation has an independent legal identity, *Micciche v. Billings,* 727 P.2d 367, 369 (Colo.1986), the plain language of the statute dictates that only the corporation is liable for costs and attorney fees, not an officer of the corporation who has signed it in an official capacity. Accordingly, only JW is liable for the costs and attorney fees expended by the Elliotts in defending against the liens.

There are, of course, situations in which a court will disregard the corporate form and hold shareholders or directors liable for the obligations of the corporation. *Id.* at 372–73. Here, however, the court made no findings regarding piercing of the corporate veil and the Elliotts did not plead or ask for relief under that theory.

The Elliotts nevertheless note that a division of this court has held that an adjacent statute in the article governing mechanics' liens, which creates a statutory trust for certain construction payments, allows an officer of a corporation to be liable for a breach of that trust. *See Alexander Co. v. Packard,* 754 P.2d 780, 782 (Colo.App.1988) (analyzing section 38–22–127, C.R.S.2010). They contend that the excessive lien statute imposes similar liability upon the officer of a corporation who files an excessive lien.

But the two statutes are different. The trust statute requires that "[a]ll funds disbursed to any contractor ... shall be held in trust." § 38–22–127(1), C.R.S.2010. The *Packard* division held that this language imposed a fiduciary duty on a corporate officer who completely controlled the financial affairs of the corporation that had received such funds. *Packard*, 754 P.2d at 782 (citing *In re Specialized Installers, Inc.*, 12 B.R. 546, 554 (Bankr.D.Colo.1981)). But we perceive no similar duty that could arise from the language of the excessive lien statute.

Moreover, there is no language in the trust statute that limits recovery for breach of trust only to the contractor to whom the funds were disbursed. *See* § 38–22–127. The excessive lien statute, in contrast, specifically limits liability only to the person who files the lien. *See* § 38–22–128 (the "person who files [such] a lien ... shall forfeit all rights to such lien plus such person shall be liable ... in an amount equal to the costs and all attorney's fees").

■■ The Elliotts alternatively urge us to conclude that a knowing violation of the excessive lien statute constitutes a tort for which an officer can be held personally liable. It is true that an officer of a corporation is liable for torts that he or she personally commits even if acting in an official capacity on behalf of the corporation. *Snowden v. Taggart*, 91 Colo. 525, 530–31, 17 P.2d 305, 307 (1932). But the violation of a statute in itself does not constitute a tort. *See, e.g., Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 145 (Colo.2003) (analyzing a violation of the Colorado Consumer Protection Act as an independent cause of action, separate from the plaintiff's tort claims). A person's actions could constitute both a violation of a statute and a separate, recognizable cause of action in tort, but in this case the Elliotts did not assert any other tort claims against Wodiuk for his involvement in JW's filing of the lien.

The Elliotts cite language in several cases indicating that a tort arises from the violation of a statute that declares a right and establishes a standard of conduct for the protection of that right. *Bergman v. United States*, 567 F.Supp. 460, 462 (D.Colo.1983) (citing *Newt Olson Lumber Co. v. Sch. Dist. No. 8*, 83 Colo. 272, 274, 263 P. 723, 724 (1928)) (concluding that this reading of *Newt Olson* is a "rough statement of the theory of implied statutory causes of action"), *aff'd*, 751 F.2d 314 (10th Cir.1984). We acknowledge that some authorities refer to the violation of a statutorily granted right as a tort. *Id.; see also* 1 Stuart M. Speiser et al., *The American Law of Torts* § 1.41 (2003) ("Statutory systems may *create* tort liability."). But merely referring to such a cause of action as a tort does not change the scope of the rights granted and liabilities imposed by the statutory language itself. *See* Speiser at § 1.41.

Accordingly, Wodiuk is not personally liable for costs and attorney fees incurred by the Elliotts in defending against the excessive lien. Hence, the portion of the judgment awarding such costs and fees against Wodiuk cannot stand.

### III. Legal Standard for Filing of Excessive Lien

JW contends that the trial court improperly applied a negligence standard instead of the statutory knowledge standard when determining that JW was liable for filing an excessive lien. We disagree.

#### A. Standard of Review

We review de novo whether the trial court applied the correct standard of law. *Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't*, 196 P.3d 892, 897–98 (Colo.2008).

#### B. Law

The excessive lien statute imposes liability when a person files a lien "without a reasonable possibility that [the] amount claimed is due and with the knowledge that said amount claimed is greater than that amount then due." § 38–22–128.

#### C. Application

■ JW contends that the trial court held that it should have known, not that it actually knew, that the amounts claimed were greater than the amount then due. But the trial court, with record support, stated that, at the time that it filed its liens, JW "was aware

that at least portions of draw Nos. 5 and 6 were paid directly by the Elliotts." Knowledge is defined as "an awareness … of a fact or circumstance." *Black's Law Dictionary* 950 (9th ed. 2009). The trial court therefore found that JW had knowledge that it was claiming amounts greater than the amounts actually due.

Moreover, the trial court determined that, because JW had intentionally misrepresented amounts due in draws one and four, JW knew at the time it filed its liens that it was claiming amounts that were greater than the amounts due.

We therefore conclude that the trial court properly applied the excessive lien statute.

## IV. Economic Loss Rule

JW and Wodiuk contend that the economic loss rule bars the Elliotts' misrepresentation and concealment claims. The Elliotts contend that this issue was not adequately preserved in the trial court and therefore we should not address it. In response, JW and Wodiuk concede that it was not preserved, but urge us to exercise our discretion to review the matter. We decline to do so.

We generally will not address for the first time on appeal issues not raised in or decided by the trial court. *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1008 (Colo.2008). The identification of an affirmative defense in an answer and trial management order, without more, fails to preserve a matter for appellate review. *Borquez v. Robert C. Ozer, P.C.*, 923 P.2d 166, 171–72 (Colo. App.1995), *aff'd in part and rev'd in part on other grounds*, 940 P.2d 371 (Colo.1997).

Here, JW and Wodiuk, in their answer and in the trial management order, asserted that the economic loss rule precluded the misrepresentation and concealment claims. The defense was not, however, the subject of any motion or other argument before, during, or after trial. It was therefore not preserved for appellate review. *See id.*

JW and Wodiuk nevertheless assert that appellate courts have the discretion to notice any error appearing of record, even if not presented in the trial court. *Robinson*, 179 P.3d at 1008–09. Such discretion, however, is exercised very rarely in civil cases. Courts exercise this discretion "only where necessary to prevent manifest injustice." *Wales v. Howard*, 164 Colo. 167, 170, 433 P.2d 493, 494–95 (1967) (citing *Kendall v. Hargrave*, 142 Colo. 120, 124, 349 P.2d 993, 995 (1960)); *see also Schuster v. Zwicker*, 659 P.2d 687, 690 (Colo.1983) (citing *Polster v. Griff's of America, Inc.*, 184 Colo. 418, 423, 520 P.2d 745, 748 (1974)) ("We have recognized that exercise of such discretion is appropriate to correct fundamental error resulting in a miscarriage of justice."); *Ortho Pharm. Corp. v. Heath*, 722 P.2d 410, 418–19 (Colo.1986) (citing *Kendall*, 142 Colo. at 124, 349 P.2d at 995) (exercising such discretion "when in the interest of justice it is appropriate to do so"), *overruled by Armentrout v. FMC Corp.*, 842 P.2d 175, 183 (Colo.1992); 9C Charles Alan Wright & Arthur P. Miller, *Federal Practice and Procedure* § 2558 (3d. ed. 2008) (findings of civil plain error under Fed.R.Civ.P. 51(d) "have been confined to the exceptional case in which the error seriously has affected the fairness, integrity, or public reputation of the trial court's proceedings" and courts routinely characterize the requisite severity of the error as "fundamental" or "miscarriage of justice").

In two recent Colorado Supreme Court cases, the court has exercised its discretion to review unpreserved issues that involved implicit findings in the trial court's orders. *Robinson*, 179 P.3d at 1009; *Roberts v. Am. Family Mut. Ins. Co.*, 144 P.3d 546, 550–51 (Colo.2006). It reasoned that the trial court's implicit ruling had "directly affected the validity of the judgment" and therefore exercise of the appellate court's discretion was appropriate. *Robinson*, 179 P.3d at 1009. In addition, the supreme court has cited other factors that affect whether a court should exercise discretion to hear an unpreserved argument, such as whether the issue presented involves only a question of law and whether the parties have fully briefed the issue on appeal. *Id.*

Here, the application of the economic loss rule is a question of law and the parties have briefed it fully on appeal. How-

ever, the trial court in this case did not rely on a "misreading of the controlling law" in formulating its judgment, nor did it make any implicit findings that would indicate it addressed the economic loss issue *sub silentio*. *See id.* Rather, it never considered the application of the economic loss rule because JW and Wodiuk never requested it to do so.

Moreover, JW and Wodiuk could have raised the issue of the application of the economic loss rule before trial, which is important to us because, if the rule did apply, its application would have dispensed with the Elliotts' tort claims entirely and would have prevented the waste of judicial resources (as well as attorney fees) required for a trial on those claims.

Because we do not perceive that the fairness, integrity, or public reputation of the trial court's proceedings will be called into question if we decline to exercise our discretion, we will not review this unpreserved contention.

## V. Insufficient Evidence of Damages for Misrepresentation Claim

JW and Wodiuk contend that there was insufficient evidence to support the trial court's determination of damages on the Elliotts' misrepresentation and concealment claims. We disagree.

### A. Standard of Review

We review de novo whether sufficient evidence supports a damages award. *Jagow v. E–470 Pub. Highway Auth.*, 49 P.3d 1151, 1158 (Colo.2002). In doing so, we must construe the evidence in the light most favorable to the prevailing party. *Gleason v. Phillips*, 172 Colo. 66, 68, 470 P.2d 46, 47 (1970).

### B. Law

■ The measure of damages in a fraud action is the difference between the actual value of the benefits received and the value of those benefits if they had been as represented. *Trimble v. City & County of Denver*, 697 P.2d 716, 723 (Colo.1985).

### C. Application

■ JW and Wodiuk first assert there was no evidence that the Elliotts paid the "Pueblo Truss" invoice, which was one of the three invoices the trial court found to be altered or fabricated. But the record reveals that the invoice was included as backup documentation for the amounts requested in draw four, which the Elliotts paid. Also, not all of the amounts requested in draw four were accounted for in the attached documentation. The trial court therefore could have determined that the fabricated Pueblo Truss invoice included trusses that were represented by JW and Wodiuk to be part of the benefit that the Elliotts received along with the other work billed in draw four. Sufficient evidence thus supports the trial court's determination that because no trusses were ever delivered, the amount of the invoice constituted the difference between the benefit actually received and the value represented.

■ JW and Wodiuk also contend that the Elliotts have suffered no damages on any of the altered or fabricated invoices because, even if the Elliotts paid them, they never paid more than the fixed price of the portions of construction to which those invoices related. Specifically, JW and Wodiuk contend that the value as represented for those portions of the construction was equal to the value received because the parties had agreed to a fixed price for these items and the Elliotts never paid more than that price. We disagree.

It is true that, if JW had performed its obligations under the contract, it would have been entitled to the entire fixed price for those portions of construction. But JW was not entitled to those amounts in this case because it breached the contract. It was only entitled to payment for the actual costs it incurred; payment for the fixed fee was to occur after completion of the entire project.

Moreover, JW's line of reasoning depends upon a determination of damages under a contract theory. However, the trial court held that JW's misrepresentations induced the Elliotts to pay more in each of the subject draw requests than the value of the services that JW had provided. That determination employs the proper measure of

damages for a tort claim and there is sufficient evidence in the record to support the trial court's calculation of damages based upon that measure.

## VI. Failure to Decide JW's Breach of Contract Claim

JW contends that the trial court erred by failing to rule on its claim for breach of contract against the Elliotts. We disagree.

### A. Law

 A trial court should issue a ruling on a claim properly before it. When a trial court fails to rule on a claim, we generally must remand for it to make such a ruling. *Lucht's Concrete Pumping, Inc. v. Horner,* 224 P.3d 355, 362 (Colo.App.2009) (*cert. granted* Feb. 1, 2010).

### B. Application

Here, JW argued that the Elliotts had breached the contract (1) by terminating it without justification and (2) by failing to pay JW for work actually performed under the contract that it requested in draws five and six. The trial court determined, however, that the Elliotts were justified in terminating JW. Also, as a part of its determination of damages with regard to the misrepresentation and concealment claims, the trial court determined that the Elliotts had overpaid JW for the work that it had completed before termination. In making this determination, the trial court considered all amounts paid by the Elliotts and compared that with the actual costs of construction incurred by JW, including the work that was the subject of draws five and six. The trial court's rulings therefore necessarily resolved JW's claim for breach of contract. *See Delta Sales Yard v. Patten,* 870 P.2d 554, 557 (Colo.App.1993) (while court did not expressly rule on certain constitutional challenges, its rejection of them was implicit in the court's application of the statute), *aff'd,* 892 P.2d 297 (Colo.1995).

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

## VII. Attorney Fees

The Elliotts request an award of attorney fees against JW and Wodiuk for defending the appeal of the excessive lien award. We agree that they are entitled to an award, but only against JW. We exercise our discretion to remand this issue to the trial court with directions to determine the amount of fees that should be allocated to the defense of the excessive lien claim. *See* § 38–22–128; C.A.R. 39.5.

That part of the judgment imposing personal liability against Wodiuk for costs and attorney fees incurred by the Elliotts in defending against the excessive liens is reversed. The balance of the judgment is affirmed, and the case is remanded for determination of appellate attorney fees to be awarded in favor of the Elliotts and against JW.

LOEB and PLANK *, JJ., concur.

